**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

CHRISTOPHER CODY WORSHAM,           *
ADC #164071,                        *
                                    *
            Plaintiff,              *
v.                                  *           No. 3:17cv00149-JJV
                                    *
BLAINE CAGLE, Sergeant,             *
Greene County Sheriff's Department; *et al.*, *
                                    *
            Defendants.             *

<u>**MEMORANDUM AND ORDER**</u>

## I.    INTRODUCTION

Christopher Cody Worsham ("Plaintiff") brings this action *pro se* and under 42 U.S.C.

§ 1983. (Doc. No. 2.) He alleges Defendants Blaine Cagle, Nathan Whitt, Skyler Jones, Bobby

Williams, and Scott Young,[1] officials at the Greene County Detention Center, subjected him to

excessive force. (*Id*. at 4-6.) Defendants have filed a Motion for Summary Judgment, contending

they are entitled to judgment as a matter of law on Plaintiff's claims. (Doc. Nos. 107-11.) Plaintiff

has filed a Response and several supporting documents (Doc. Nos. 112-14, 119-22), and

Defendants have replied (Doc. No. 115); this matter is now ripe for a decision. After careful

review, and for the following reasons, I find summary judgment is appropriate. Defendants'

Motion for Summary Judgment is GRANTED and Plaintiff's Complaint is DISMISSED.

---

[1] Plaintiff's claim against Defendant David Carter was previously dismissed without prejudice for failure to state a claim. (Doc. Nos. 5, 12.)

## II.    FACTS

According to Plaintiff's Complaint, he was "wrongly assaulted and beat on" by Defendants on July 26, 2016.[2]  (Doc. No. 2 at 4.)  He says Defendants "crushed [his] skull into [his] brain," causing a brain bleed resulting in "life long damages."  (*Id*. at 5.)  Plaintiff's medical records indicate he was taken to a local emergency room the following morning, where he was noted to have a laceration to his head and a concussion.  (Doc. No. 17 at 1.)  A subsequent CT scan showed hemorrhaging and a skull fracture.  (*Id*. at 4.)  Plaintiff was ultimately treated in the Intensive Care Unit at CHI St. Vincent Infirmary in Little Rock, where his diagnoses were listed as a basilar skull fracture, traumatic subdural hematoma, intracerebral hematoma, and traumatic subarachnoid hemorrhage.  (Doc. No. 62 at 3.)

## III.    SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ. P. 56(c)(1)(A).

When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials, but must demonstrate the

---

[2] Incident reports submitted by Defendants show the use of force incident actually occurred on July 25, 2016.  (Doc. No. 109-4.)

existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of W. Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

## IV.  ANALYSIS

### A.  Official Capacity Claims

Plaintiff has sued Defendants in both their personal and official capacities. (Doc. No. 2 at 2.) Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690, n. 55 (1978)). As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Id.* at 166. Thus, Plaintiff's official capacity claims against Defendants are to be treated as claims against Greene County. Section 1983 liability against municipalities and other local government units is limited:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to

governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell*, 436 U.S. at 690-91.  A municipality cannot be held liable under § 1983 on a *respondeat superior* theory.  *Id*. at 691.  *See also Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535-36 (8th Cir. 1999).

Plaintiff has not identified any official policy or unofficial custom of Greene County that caused or contributed to his alleged injuries.  Because Plaintiff makes no allegation that Defendants were implementing an unconstitutional policy or custom, his official capacity claims against them must be dismissed.

### B.    Personal Capacity Claims

#### 1.    Defendant Williams

Defendant Williams contends he is entitled to summary dismissal of Plaintiff's claim against him because he was not involved in the use of force incident.  (Doc. No. 108 at 3.) Plaintiff's Complaint is silent about Defendant Williams's involvement; he initially named only Defendant Cagle and identified all others as Does.  (Doc. No. 2 at 1-2, 4-6.)  Plaintiff named Defendant Williams in a subsequent Motion for Service.  (Doc. No. 6.)  However, as Defendant Williams points out, none of the incident reports describing the use of force incident mentions him. (Doc. No. 109-4 at 2-6.)  And according to Defendant Williams's Affidavit, he was not on duty at the time of the incident.  (Doc. No. 109-11 at 2.)  Plaintiff does not dispute that Defendant Williams had no involvement, stating in his Affidavit of Disputed and Undisputed Facts that he "mist[ook] identity as one officer as Bobby Williams."  (Doc. No. 114 at 1.)  Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990).  Because the evidence does not demonstrate a causal link to the

4

alleged deprivation of Plaintiff's rights on Defendant Williams's behalf, he should be dismissed from this action.

2.      All Other Defendants

Defendants contend they are entitled to qualified immunity on Plaintiff's claims against them in their personal capacities.  (Doc. No. 108 at 14.)  Qualified immunity protects government officials who acted in an objectively reasonable manner and shields an official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. *McClendon v. Story Cty. Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005).  Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (the privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial").

To determine whether defendants are entitled to qualified immunity, courts generally consider two questions:  (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Pearson*, 555 U.S. at 236).  Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. *Id.*  Upon review

of the record in this case, I find the facts shown, construed in the light most favorable to Plaintiff, do not establish a violation of his constitutional rights.

When addressing an excessive force claim brought under § 1983, a court's analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." *Id.* According to Plaintiff's Complaint and to the Affidavit of Allison Huckabee, Greene County Detention Center Jail Administrator, Plaintiff was detained for probation revocation and was an Arkansas Department of Correction ("ADC") inmate awaiting ADC pickup at the time of the use of force incident. (Doc. Nos. 2 at 3, 109-1 at 3.) Because of Plaintiff's status as a prisoner, his excessive force claims are to be evaluated under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

In an Eighth Amendment excessive force claim, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Under this approach, the extent of injury suffered by an inmate is one factor that may suggest "whether the use of force could plausibly have been thought necessary" in a particular situation, "or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). In

6

determining whether a use of force was wanton and unnecessary, it is also proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id*. Thus, the extent of the resulting injury, "while material to the question of damages and informative as to the likely degree of force applied, is not in and of itself a threshold requirement" for proving an Eighth Amendment excessive force claim. *Williams v. Jackson*, 600 F.3d 1007, 1012 (2010) (citing *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam)).

Defendants contend the force they used on Plaintiff was applied in a good-faith effort to maintain or restore discipline, not maliciously and sadistically to cause harm. (Doc. No. 108 at 7.) After careful review of all the evidence, particularly the incident reports and videos submitted in support of Defendants' Motion, I agree. As Defendants point out, the incident reports and video evidence show there were actually two separate use of force incidents, the first occurring in the pod and the second occurring in the hallway after Plaintiff was removed from the pod.

a.    Pod Incident

According to Defendants' statements and incident reports, which have been incorporated into their Affidavits, Plaintiff had teeth pulled earlier in the day and had been placed on a soft diet. (Doc. No. 109-8 at 3.) He was not satisfied with the soft diet tray he received at dinnertime and placed an emergency intercom call to Defendant Whitt from the dayroom in his pod. (*Id*.) After the two discussed the situation, Plaintiff began screaming at Defendant Whitt, who told him "he could calm down or go to lockdown." (*Id*.) Plaintiff then said, "Come down here and I will stick this cookie down your throat you mother fucker." (*Id*.) Defendants Whitt, Young, and Cagle approached the door to Plaintiff's pod and found him waiting at the door, hitting the door and covering his face with his shirt. (*Id*., Doc. No. 109-7 at 6.) According to Defendant Cagle, "[t]hese

7

mannerisms with his additional threatening told me he had intentions of harming an officer." (Doc. No. 109-7 at 6.) Through the door, Defendant Cagle repeatedly ordered Plaintiff to go to the wall. (*Id*.) Plaintiff refused to comply, continuing to yell and threaten the jail staff. (*Id*.) Defendant Cagle waited until Plaintiff stepped away from the door and then entered the pod, taking Plaintiff by his wrist to escort him out of the pod. (*Id*.) Plaintiff pulled away and turned on Defendant Cagle, at which point Defendant Cagle took him to the ground to be handcuffed. (*Id*.) Defendants Whitt and Young entered the pod to assist, and Plaintiff continued to resist. (Doc. No. 109-8 at 3.) Defendant Whitt was able to handcuff one wrist; when Plaintiff resisted further, Defendant Cagle deployed a short burst of pepper spray to his face. (*Id*.) As Defendants began to remove Plaintiff from the pod, "[h]e tried to get loose of the cuff and turned with his free fist striking [Defendant Whitt] in the nose causing it to bleed." (*Id*.) Plaintiff was finally removed from the pod at this point and handcuffed behind his back. (*Id*., Doc. No. 109-7 at 6.)

This account of the use of force incident is corroborated by the video evidence. Although there is no audio, Plaintiff appears agitated before and after placing the intercom call. (Doc. No. 109-5 at 00:06-02:40.) As he speaks on the intercom, other detainees in the dayroom stop and watch. (*Id*. at 02:30.) After placing the intercom call, Plaintiff approaches the door to the pod and begins pacing in front of it and leaning against it while other detainees look on. (*Id*. at 02:43-03:20.) He covers his face with his shirt. (*Id*. at 03:22.) The other detainees begin to clear the dayroom and return to their cells. (*Id*. at 03:46.) Plaintiff begins to hit the door with his hand and then paces some more. (*Id*. at 04:12.) When Defendant Cagle enters the pod, he motions for Plaintiff to come with him and then guides him to the wall. (*Id*. at 06:18.) Plaintiff immediately resists. (*Id*. at 06:23.) Defendant Cagle takes him to the ground, and three more officers enter to assist in handcuffing him. (*Id*. at 06:28.) Plaintiff continues to resist while the officers struggle to

get him handcuffed.  (*Id*. at 06:30-07:30.)  As the officers bring him to his feet and begin to escort him out of the pod, his arm can be seen swinging.  (*Id*. at 07:30-08:01.)

The United States Supreme Court has held that when uncontested video evidence is submitted in support of a motion for summary judgment, the facts should be viewed in the light depicted by the video evidence.  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  This is so despite the fact that summary judgment evidence is normally to be viewed in the light most favorable to the nonmoving party:  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id*. at 380.  Here, the video evidence shows Defendants used force on Plaintiff because of his threatening behavior and his refusal to comply with orders.  The force continued throughout the encounter because of Plaintiff's refusal to be handcuffed and his continued physical resistance.  Plaintiff contends he did not resist when Defendant Cagle guided him to the wall; he only "turned a little to the side to talk," and Defendant Cagle then slammed him on the ground.  (Doc. No. 114 at 4-5.)  But the video does not support his version of the facts.  Plaintiff can be seen jerking his arms away before Defendant Cagle takes him to the ground.  (Doc. No. 109-5 at 06:20-06:30.)  And, as Defendants state in their Affidavits, the presence of other detainees in the pod at the time made Plaintiff's restraint and removal time sensitive.  (Doc. No. 109-7 at 3, 109-9 at 3, 111-1 at 2.)

In short, nothing in the record tends to show Defendants acted maliciously or sadistically when they used force on Plaintiff in the pod.  Rather, the evidence supports Defendants' position that they acted in a good-faith effort to restore discipline.  Their statements establish Plaintiff was

threatening officers[3] and refusing to comply with orders, and the video establishes he refused to be handcuffed and fought with Defendants.  Plaintiff's behavior was reasonably perceived by Defendants as a threat, and the force used – "hands on" force to take him to the ground and a short burst of pepper spray when he still would not comply – was commensurate with his resistance.

        b.    Hallway Incident

        According to Defendants' Affidavits and statements, Plaintiff's resistance continued into the hallway as Defendants Cagle and Jones escorted him from the pod to the emergency restraint chair, where they hoped to give him an opportunity to calm down.  (Doc. Nos. 109-7 at 3, 109-10 at 3.)  On the way there, Plaintiff lifted his handcuffed arms over his head to the front of his body. (Doc. Nos. 109-7 at 3-4, 109-8 at 2, 109-9 at 3-4, 109-10 at 3.)  Defendants Cagle and Jones perceived this situation as quite dangerous because Plaintiff could have easily choked them.  (Doc. Nos. 109-7 at 4, 109-10 at 4.)  Therefore, they immediately took Plaintiff to the ground, with Plaintiff continuing to resist.  (Doc. Nos. 109-7 at 4, 109-10 at 4.)  As they started to place him in the emergency restraint chair, Plaintiff began to spit on the officers while kicking and swinging, and Defendant Cagle used another short burst of pepper spray to get him to comply.  (Doc. Nos. 109-4 at 3, 109-7 at 4, 109-10 at 6.)  After he was finally restrained, Plaintiff was escorted to the shower, where he was decontaminated and given new clothes, and then escorted to the infirmary.[4] (Doc. Nos. 109-4 at 3, 109-7 at 4, 109-10 at 6.)

─────────────────

[3] Although Plaintiff denies he intended to harm an officer (Doc. No. 114 at 4), he repeatedly acknowledges he was angry, upset, and aggravated because he did not receive the appropriate tray. (*Id*. at 2-4.)  He does not dispute that he told Defendant Whitt he would kick the door all night until he got his soft food and that he threw a chewed up cookie at the door.  (Doc. Nos. 109 at 2, 114 at 3.)

[4] According to Defendant Cagle, a nurse bandaged Plaintiff's head wound and cleared him to return to his cell, but Defendant Cagle had him placed in a medical observation cell due to a concern he might have suffered a concussion.  (Doc. No. 109-7 at 12.)  The following morning,

Again, the video evidence corroborates Defendants' version of the facts.  Although Plaintiff claims he did not lift his handcuffed arms over his head and could not have done so (Doc. No. 113 at 1), he can be seen doing so in the video.  (Doc. No. 109-6 at 07:53-07:54.)  While I agree it seems implausible, it happened.  The video also shows Defendants Cagle and Jones taking Plaintiff to the ground and holding him there while they wait for the emergency restraint chair to arrive.  (*Id*. at 07:55-09:03.)  Plaintiff appears to continue to resist as officers place him in the chair.  (*Id*. at 09:30.)  As with the use of force incident in the pod, there is simply no evidence to suggest Defendants acted maliciously or sadistically when they used force on Plaintiff in the hallway.  He somehow managed to lift his handcuffed arms over his head and to the front of his body, a situation that posed a danger to Defendants Cagle and Jones and one which they reasonably perceived as a threat.  Their taking Plaintiff to the ground in order to regain control over him was a reasonable and proportionate response.  Finally, Defendant Cagle's use of pepper spray was also reasonable in light of Plaintiff's continued resistance and fighting with officers who sought to restrain him.  The United States Court of Appeals for the Eighth Circuit has observed that a limited application of pepper spray "to control a recalcitrant inmate constitutes a 'tempered response by prison officials' when compared to other forms of force."  *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)).

---

Defendant Cagle asked another nurse to check on Plaintiff and this nurse, in consultation with a doctor, decided to send him to the emergency room.  (*Id*. at 13.)  Plaintiff disputes this and submits an unverified statement from the original nurse, who says she told officers Plaintiff needed to go to the emergency room for stitches immediately after the incident.  (Doc. No. 112 at 27.)  According to the nurse, officers refused to take him and instructed her to clean and bandage the wound.  (*Id*.)  Because Plaintiff has not stated a claim for inadequate medical care, this dispute makes little difference.

11

I acknowledge Plaintiff suffered a serious head injury as a result of one or both of these use of force incidents.  I have reviewed the medical records he has submitted and have not taken his allegations, or his injury, lightly.  However, as noted previously, the extent of injury suffered by an inmate is only one of several factors to be considered in evaluating an Eighth Amendment excessive force claim.  *Hudson*, 503 U.S. at 7.  Importantly, under the Eighth Amendment standard, "the subjective motivations of the individual officers are of central importance" in deciding whether force was used maliciously and sadistically.  *Graham*, 490 U.S. at 398.  This makes the Eighth Amendment standard "different and less protective" than the Fourth Amendment's objective reasonableness standard for excessive force claims raised by non-prisoners.  *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014).  Under the Eighth Amendment, proof of motive is required:

> [W]hen an official's intent is an element of the § 1983 claim, as it is in Eighth Amendment excessive force claims, and if the official has made a properly supported motion for summary judgment based on qualified immunity, the plaintiff "must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."

*Id*. (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)).

Here, Defendants have supported their Motion for Summary Judgment with statements, incident reports, affidavits, and video evidence, which together show they used force in order to regain control over Plaintiff, who was refusing to comply with their orders and physically resisting restraints.  Accordingly, it is Plaintiff's burden to identify "affirmative evidence" tending to indicate Defendants acted maliciously and sadistically for the purpose of causing harm.  He has not done so.  From his Complaint to the exhibits he has submitted throughout this case, to the many documents filed in support of his Response to Defendants' Motion, Plaintiff focuses almost exclusively on the extent of his injuries.  (Doc. Nos. 2, 17, 62, 121.)   He has not described the

force used or attempted to explain why it was excessive. There is no "specific evidence of a malicious motive to harm, or evidence that the force used was so greatly in excess of that needed to restore and maintain order as to raise a reasonable inference of malicious motive." *Burns*, 752 F.3d at 1140. In short, Plaintiff has offered no evidence from which it can be inferred that Defendants' conduct crossed the line.

Plaintiff does argue the video evidence produced by Defendants in discovery is incomplete. He mentions three types of video evidence that have not been provided to him. First, based on a photograph produced in discovery of Defendant Jones apparently wearing a body camera, Plaintiff suggests Defendants are withholding body camera footage of the use of force incidents. (Doc. No. 112 at 21-23.) But according to the supplemental Affidavit of Allison Huckabee, there is no body camera footage to produce, and it never existed. (Doc. No. 115-1 at 2.) Plaintiff's Motion to Compel the production of this evidence was previously denied on the basis of Defendants' confirmation it did not exist. (Doc. Nos. 102-03.) Second, Plaintiff seems to suggest any video from the infirmary or from the medical observation cell where he was held after the use of force should be produced. (Doc. No. 112 at 14-15, 18.) Because Plaintiff has not stated a claim for inadequate medical care, this evidence would be irrelevant. Again, his Motion to Compel production of this evidence was denied. (Doc. Nos. 85, 92.) Finally, Plaintiff claims there was a third use of force incident not included on the video provided. (Doc. No. 119 at 2.) He bases this claim on Defendants' statements, which explain that after Plaintiff was removed from the pod he was handcuffed behind his back "after brief resistance" and being "taken to the ground once more."[5] (Doc. Nos. 109-7 at 6, 109-8 at 2.) Assuming Defendants used force outside the pod

---

[5] Plaintiff points to a particular line in Defendant Jones's statement: "In doing so we used the force necessary to restrain the inmate and we slammed him on the floor." (Doc. No. 109-10 at 6.)

13

while they were handcuffing Plaintiff, Plaintiff has not claimed it was excessive.  In fact, he has

not made any allegations about this incident, has repeatedly stated he does not remember what

happened (Doc. No. 109-13 at 12-13), and bases his assumption about this incident exclusively on

Defendants' statements.  From those statements, it is clear Defendants were trying once again to

handcuff Plaintiff and he "resisted the whole time."  (Doc. No. 109-10 at 6.)  And, according to

Ms. Huckabee's supplemental Affidavit, the only force incidents at issue are those that occurred

in the pod and the hallway; "all the video of the force incidents" has been produced.  (Doc. No.

115-1 at 1-2.) Plaintiff cannot avoid summary judgment by suggesting Defendants are withholding

video evidence of a third use of force incident that was not part of his claim and about which he

has made no allegations.

For these reasons, Plaintiff has failed to show Defendants applied force maliciously and

sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline.

*Hudson*, 503 U.S. at 7.  Because the facts alleged or shown, construed in the light most favorable

to Plaintiff, do not establish a violation of a constitutional or statutory right, Defendants Cagle,

Whitt, Jones, and Young are entitled to qualified immunity on Plaintiff's claims against them in

their personal capacities.

Defendants are entitled to judgment as a matter of law, and their Motion for Summary

Judgment is granted.  All other pending motions are denied as moot.

## V.    CONCLUSION

IT IS, THEREFORE, ORDERED that:

---

But this was clearly part of the hallway incident, *after* Plaintiff had moved his handcuffed arms
from behind his back to the front of his body, and not part of a third incident.  It is shown in the
hallway video.

1.      Defendants' Motion for Summary Judgment (Doc. No. 107) is GRANTED.

2.      Plaintiff's claims against Defendants Cagle, Whitt, Jones, Williams, and Young are DISMISSED with prejudice, and Plaintiff's cause of action is dismissed.

3.      Plaintiff's recently filed Motion to Dismiss Party (Doc. No. 116), Motion to Appoint Counsel (Doc. No. 117), and Motion to Subpoena (Doc. No. 118) are DENIED as moot.

4.      Pursuant to 28 U.S.C. § 1915(a)(3), an *in forma pauperis* appeal from this Order or the accompanying Judgment would not be taken in good faith.

DATED this 25th day of April, 2018.

JOE J. VOLPE
UNITED STATES MAGISTRATE JUDGE